UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GREGORY GARDNER,

                Plaintiff,

        -v-

THE CITY OF NEW YORK; NYPD
SERGEANT ("SGT.") JOHN DOE 1,
Individually and in His Official Capacity;
NYPD OFFICERS ("P.O.") JOHN DOES 2
through 8, Individually and in Their Official
Capacities; NEW YORK CITY
DEPARTMENT OF CORRECTIONS
("NYC DOC"); NYC BOARD OF
CORRECTION ("NYC BOC"); NYC
DOC Wardens JOHN DOES 9 through 14,
Individually and in Their Official Capacities;
NYC DOC Captains JOHN DOES 15
through 20, Individually and in Their Official
Capacities; PRISON HEALTH
SERVICES, INC. ("PHS"); Bellevue
Hospital Prison Ward Medical Director JOHN
DOE 21, Individually and in His Official
Capacities; PHS Physicians JOHN DOES 22
through 25, Individually and in Their Official
Capacities; PHS JOHN DOES 26 through 30,
Individually and in Their Official Capacities;
PHS JOHN DOES 31 through 35, Individually
and in Their Official Capacities; (The names
being fictitious, as the true
names and shield numbers are not presently
known, and in their individual and official
capacities under federal law and in their
individual capacities only under state law),

                Defendants.

**COMPLAINT AND DEMAND FOR A
JURY TRIAL**

Index No. 12-CV-2419

---

       Plaintiff GREGORY GARDNER, through his attorney DAVID B. RANKIN of the Law

Office of Rankin & Taylor, as and for his complaint, does hereby state and allege:

1

## PRELIMINARY STATEMENT

1.     Plaintiff GREGORY GARDNER brings this civil rights action for violations of his constitutional rights, and for injuries caused by the excessive and brutal force used against him by uniformed officers of the New York Police Department ("NYPD"), and for further injuries caused by the denial of adequate medical care by physicians and nurses employed by Prison Health Services, Inc. ("PHS") who provided medical care to detainees at the Manhattan Detention Center, and the deliberate indifference of agents and employees of the Manhattan Detention Center whom plaintiff GARDNER informed of his need for medical care, and who denied plaintiff GARDNER medical care.

2.     When NYPD police officers and NYPD police sergeant forcibly entered plaintiff GARDNER's home without his permission, and used excessive force in beating him while placing him in custody, they inflicted a comminuted fracture to plaintiff GARDNER's wrist, a large laceration to his elbow, and bruising to his person resulting from repeated blows to his body. Due to subsequent failure on the part of defendants to provide adequate medical care, plaintiff GARDNER is likely to suffer from permanent range of motion limitation as well as numbness and pain in his wrist.

3.     Defendants' actions were contrary to sound medical practice, contrary to the norms of a civilized society, and in violation of the Fourth and Fourteenth Amendments of the Constitution of the United States, through the Civil Rights Act of 1871, as amended, codified as 42 U.S.C. § 1983, as said rights are secured by the laws and Constitution of the United States of America, and the statutes, regulations and ordinances of the City of New York. Plaintiff GARDNER also asserts supplemental state tort law claims.

4.     This complaint, arising from the deprivation of plaintiff GARDNER's constitutional rights, and the physical, psychological and emotional injuries he suffered while in the custody and care of the defendants, seeks compensatory damages, punitive damages and attorney's fees.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§1331, 1343 (3-4). This action is brought pursuant to 42 U.S.C. §§1983 and 1988 and the Fourth and Fourteenth Amendments to the Constitution of the United States.

6.     Venue is proper pursuant to 28 U.S.C. §1391(a)(2) in that plaintiff's claim arose in the Southern District of New York.

7.     An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. §1988.

## PARTIES

8.     Plaintiff GREGORY GARDNER ("Mr. GARDNER") was at all times relevant to this action a resident of the County of New York in the State of New York.  Mr. GARDNER is currently a resident of the Couth of New York in the State of New York.

9.     Defendant The City of New York ("CITY") is a municipal corporation authorized under the laws of the State of New York, and on information and belief, defendant CITY receives federal funding and is a "public entity" as defined by 42 U.S.C. § 12131. Defendant CITY operates a number of detention facilities through its Department of Correction ("DOC"), including the Manhattan Detention Center.

10.     Defendant CITY is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the NYPD.

3

11.     Defendants SGT. JOHN DOE 1 and NYPD Officers ("P.O.") JOHN DOES 2 through 8 (collectively referred to as the "officer-defendants") are and were at all times relevant herein, officers, employees and agents of the NYPD. At all times relevant herein, the individual defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of NYPD, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD. The officer-defendants are being sued under federal law in their individual and official capacities, and under the Constitution and laws of the State of New York in their individual capacities only.

12.     The NYC DOC, through its senior officials at the central office, in each facility, and in its specialized units, promulgates and implements policies, including those with respect to access to medical and other program services mandated by law. In addition, senior officials in the NYC DOC are aware of and tolerate certain practices by subordinate employees in the jails, including those that are inconsistent with formal policy. These practices, because they are widespread, long-standing, and deeply embedded in the culture of the agency, constitute unwritten NYC DOC policies or customs. The NYC DOC is also responsible for the appointment, training, supervision, and conduct of all NYC DOC personnel, including the defendants referenced herein.

13.     On information and belief, defendant Prison Health Services, Inc. ("PHS") provides private managed healthcare for correctional facilities, including the Manhattan Detention

Facility. In carrying out its duties, PHS provides medical and mental health services to prisoners and is required to oversee the personnel in the Bellevue Hospital Prison Ward.

14.     On information and belief, defendant New York City Bureau of Corrections ("NYC BOC") supervised area correctional facilities, including the Bellevue Hospital Prison Ward. In carrying out these duties during the time at issue, BOC was required to oversee personnel in the Bellevue Hospital Prison Ward, advancing department directives and orders governing the care of inmates with disabilities.

15.     On information and belief, at all times relevant hereto, defendants PHS Physicians JOHN DOES 22 through 25 ("PHS physician defendants") signed their names to plaintiff GARDNER's medical records. On information and belief, physician defendants' duties included but were not limited to supervising the PHS staff employed at the Manhattan Detention Center, ensuring that staff provided adequate and competent care to inmates, and caring for all patients in Manhattan Detention Center. These responsibilities were required to be carried out in a manner consistent with the legal mandates that govern the operation of the New York City jails, including the DOH/MH Correctional Health Services policies, procedures, directives, and protocols, in addition to all relevant local, state, and federal statutes and regulations.

16.     On January 3, 2011 and throughout their treatment of Mr. GARDER, the PHS physician defendants were engaged in the practice of medicine at Bellevue Hospital, and in that capacity provided medical care to Mr. GARDNER on that date and thereafter.

17.     The PHS physician defendants are being sued under federal law in their individual and official capacities, and under the Constitution and laws of the State of New York in their individual capacities only.

18.    On information and belief, defendants NYC DOC Wardens JOHN DOES 9 through 14 are Wardens of Security and Programs within the Manhattan Detention Center ("DOC Warden defendants"). The DOC Warden defendants' responsibilities included, at all relevant times, supervision of correction officers, captains and other supervisors with respect to the care, custody and control of prisoners confined in the Manhattan Detention Center. These responsibilities were required to be carried out in a manner consistent with the legal mandates that govern the operation of the NYC DOC and its facilities, including department directives and orders governing the care of inmates with disabilities. The DOC Warden defendants are being sued under federal law in their individual and official capacities, and under the Constitution and laws of the State of New York in their individual capacities only.

19.    On information and belief, defendants NYC DOC Captains JOHN DOES 15 through 20 ("DOC Captain defendants") had direct firs-line supervisory responsibilities over correction officers assigned to NYC DOC facilities, including responsibility to take appropriate measures to ensure and protect the health and safety of inmates assigned to their housing or program areas. These responsibilities were required to be carried out in a manner consistent with the legal mandates that govern the operation of NYC DOC and its facilities, including department directives and orders governing the care of inmates with disabilities, at all relevant times to this complaint. The DOC Captain defendants are being sued under federal law in their individual and official capacities, and under the Constitution and laws of the State of New York in their individual capacities only.

20.    On information and belief, defendant Bellevue Prison Ward Medical Director JOHN DOE 21 (defendant Medical Director), in carrying out his duties, was responsible for oversight of the Prison Ward staff and required to assist disabled inmates with their medical and daily-

living needs in a manner consistent with the legal mandates governing the operation of DOH/MH and its facilities, including department directives and orders governing the care of inmates with disabilities. Defendant Medical Director is being sued under federal law in his individual and official capacities, and under the Constitution and laws of the State of New York in his individual capacities only.

21.     At all times relevant hereto, defendants DOC JOHN DOES 26 through 30 were employees of NYC DOC whose duties included providing access to medical care for inmates at MDC, acting in the capacity of employees of NYC DOC and agents, and servants of the Department of Health and Mental Hygiene, Correctional Health Services ("CHS"), and the City, acting within the scope of their employment as such, and acting under color of state law. On information and belief, Defendants DOC JOHN DOES 26 through 30 worked at Manhattan Detention Center during the times of Mr. GARDNER's detention there, and participated in the denial of adequate medical care to plaintiff that took place during his detention. Defendants DOC JOHN DOES 26 through 30 are being sued under federal law in their individual and official capacities, and under the Constitution and laws of the State of New York in their individual capacities only.

22.     Defendant NYC DOC, DOC Warden defendants, DOC Captain defendants, and DOC JOHN DOES 31 through 35 are collectively referred to as the "DOC defendants."

23.     Defendants PHS, defendant Medical Director, and PHS Physicians and nurses are collectively referred to as the "medical defendants."

24.     The true names of defendants DOE's 1 through 35 are not currently known to the plaintiff.[1]  As to defendant DOE's entitled to representation in this action by the New York City

---

[1]      By identifying said defendants as "John Doe" plaintiffs is making no representations as to the gender of said defendants.

Law Department ("Law Department") upon their request, pursuant to New York State General Municipal Law § 50-k, the Law Department, then, is hereby put on notice (a) that plaintiff intends to name said agents and employees as defendants in an amended pleading once the true names and shield numbers of said defendants become known to plaintiff and (b) that the Law Department should immediately begin preparing their defense in this action.

## STATEMENT OF FACTS

25.     On January 3, 2011, at approximately 11:00 p.m. and thereafter in the vicinity of Mr. GARDNER's home at 33 Gold Street, #TH1, New York, New York 10038, in the County of New York, agents of the NYPD, collectively referred to as the officer-defendants, severely and maliciously beat and injured Mr. Gardner.

26.     At the approximate time and location referenced in paragraph 25 supra, the officer-defendants forcibly and without Mr. GARDNER's permission gained entry into Mr. GARDNER's home through his front door.

27.     Defendant SGT. JOHN DOE 1 immediately and without provocation seized Mr. GARDNER's right wrist, yanking his arm behind his back with such force that Mr. GARDNER heard the resulting "crack" of his bones breaking.

28.     Holding Mr. GARDNER's broken wrist and arm behind his back, defendant SGT. JOHN DOE 1 slammed Mr. GARDNER downward, smashing him into a glass coffee table with such force as to cause the glass to shatter and inflict a laceration to Mr. GARDNER's left arm, as he was thrown to the floor.

29.     While Mr. GARDNER lay face-down on the floor, defendant SGT. JOHN DOE 1 put handcuffs on him.

30.    While Mr. GARDNER lay on the floor suffering from a laceration to his arm and a broken and cuffed wrist, the officer-defendants, including one female police officer, repeatedly kicked Mr. GARDNER, jeered at him, and caused him to fear for his life.

31.    As a result of the combined shock of the break-in and ongoing assault, as well as his severe physical injuries, Mr. GARDNER defecated himself.

32.    The officer-defendants stripped Mr. GARDNER's clothes off of him, and placed him, naked, into a full-body, plastic zippered bag, similar to a "body bag."

33.    Thereafter an ambulance arrived to transport Mr. GARDNER to an emergency room. While Mr. GARDNER remained cuffed and zippered into a body bag, the officer-defendants hoisted Mr. GARDNER from where he lay on the floor and, without the assistance of a gurney, carried him to the ambulance, and threw him onto the floor of the ambulance. Defendant P.O. JOHN DOE 2 rode with Mr. GARDNER and continued to kick Mr. GARDNER in the body and head as he lay on the floor of the ambulance, cuffed and zippered into the body bag.

34.    Throughout the incident described supra, the officer-defendants behaved sadistically and maliciously, and demonstrated deliberate indifference toward Mr. GARDNER's rights and physical well-being.

35.    Mr. GARDNER was transported to Bellevue Hospital, where the officer-defendants handcuffed his broken wrist to his hospital bed, and left him that way until a nurse requested that the handcuffs be removed.

36.    Mr. Gardner remained in the emergency department at Bellevue Hospital for approximately twelve (12) hours. While at Bellevue Hospital, he was diagnosed with comminuted fractures to his wrist and forearm, as well as ulnar displacement. His wrist was

placed in a cast. Mr. GARDNER was told by the emergency room orthopedic doctor that in order to fully recover, he would need surgery. It was suggested that the surgery take place that week.

37.     The medical defendants injected Mr. GARDNER with local anesthetic, and administered stitches to his elbow. Mr. GARDNER felt extreme pain and discomfort as each of the stitches was inserted into his arm, as well as when they were removed.

38.     The following day, on January 3, 2011, Mr. GARDNER was transported from Bellevue Hospital to Central Booking and arraigned on Docket Number 2011NY00090 on the charges of Attempted Assault in the First Degree, two counts (P.L. § 110/120.10(1)); Attempted Assault in the Second Degree (P.L. § 110/120.05(2)); Assault in the 3rd Degree-DNA-Ineligible MISD, two counts (P.L. § 120.00(1)); Unlawful Imprisonment in the 2nd Degree-DNA-Ineligible MISD (P.L. § 135.05); Aggravated Harassment in the Second Degree (P.L. § 240.30(1)(a)); and Resisting Arrest (P.L. § 205.30). Unable to afford the set bail, Mr. GARDNER remained in detention in the custody of the Manhattan Detention Center until May 25, 2011.

39.     Despite that his injuries required surgery in order to achieve a full recovery, Mr. GARDNER's wrist remained in a in a cast for approximately three (3) months after the incident.

40.     While Mr. GARDNER was detained at the Manhattan Detention Center, he made repeated requests for proper medical care. Mr. GARDNER informed the corrections officers, agents of NYC DOC, and the medical defendants of his need for surgery and further medical attention. Aware of, and disregarding, a substantial and obvious risk of serious harm, NYC DOC defendants and the medical defendants failed to provide or to make accommodations for the necessary medical attention or the required surgery.

41.     On January 3, 2011, and throughout their treatment of Mr. GARDNER, the PHS physician defendants were, on information and belief, either (a) employees of the CITY, PHS,

NYC DOC, or NYC BOC acting in the scope of their employment, (b) independent contractors whose services were performed under the CITY, PHS, NYC DOC, or NYC BOC's control and supervision, or (c) held out by the CITY, PHS, NYC DOC, or NYC BOC as its apparent or ostensible agent.

42.     On January 3, 2011, and throughout their treatment and care of Mr. GARDNER, the medical defendants owed Mr. GARDNER a duty to not deviate from good and acceptable medical practice and standards of practice for physicians and nurses then prevailing in New York City.

43.     On January 3, 2011 and throughout their treatment and care of Mr. GARDNER, the medical defendants owed him a duty to not deviate from good and acceptable medical practice and standards of practice for hospitals then prevailing in New York City.

44.     On January 3, 2011 and throughout their treatment and care of Mr. GARDNER, the CITY, NYC DOC, NYC BOC, and Medical Director defendant owed Mr. GARDNER a duty to properly supervise and manage their employees, including defendants PHS Physicans and Nurses.

45.     On information and belief, on January 3, 2011, and thereafter, the PHS Physician defendants breached the applicable standard of medical care by failing to prescribe or provide medically necessary surgery.

46.     As a direct and proximate result of the breach of the applicable standard of medical care by the medical defendants, Mr. GARDNER suffered pain and continues to suffer pain and limitation in the use of his wrist, which, on information and belief, is believed to be permanent. Further, Mr. GARDNER was required to seek medical and other care, assistance and attention, in an effort to alleviate and/or cure some of the injuries and disabilities suffered.

47.     Following Mr. GARDNER's release from custody, he was informed that due to the lapse of time between the infliction of the injury to his wrist even corrective surgery would be unlikely to lead to a full recovery. At present, Mr. GARDNER suffers from pain and stiffness in his wrist, is unable to lift objects of substantial weight, and has limited range of motion that renders him incapable of performing such daily activities as writing.

48.     The medical defendants should have provided the necessary medical care and surgery to prevent the injuries incurred from the January 3, 2011 assault from becoming permanent. Due to Mr. GARDNER's condition, which was not inevitable as a result of the assault alone but, on information and belief, was caused by a reckless lack of medical care, he is at risk of suffering from these symptoms for years to come, and potentially his entire life.

**FIRST CLAIM**
**DEPRIVATION OF RIGHTS**
**UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983**
**(Against Officer-Defendants)**

49.     Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

50.     Officer-defendants, under color of state law, subjected the plaintiff to the foregoing acts and omissions, thereby depriving plaintiff of his rights, privileges and immunities secured by the Fourth and Fourteenth Amendments to the United States Constitution, including, without limitation, deprivation of the following constitutional rights: (a) freedom from unreasonable seizure of his person, including the excessive use of force; and (b) freedom from deprivation of liberty without due process of law.

51.     The officer-defendants' deprivation of plaintiff's constitutional rights resulted in the injuries and damages set forth above.

**SECOND CLAIM**
**FOURTEENTH AMENDMENT TO THE**
**UNITED STATES CONSTITUTION PURSUANT TO 42 U.S.C. § 1983**
**(Against Medical Defendants)**

52.     Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

53.     By reason of the foregoing, and by denying Mr. GARDNER adequate medical care, the medical defendants deprived plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourteenth Amendment of the United States Constitution.

54.     The medical defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their employments as PHS employed or contracted medical personnel. Said acts by medical defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. These medical defendants acted willfully, knowingly, and with the specific intent to deprive plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and the Fourteenth Amendment of the United States Constitution.

55.     As direct and proximate result of the misconduct and abuse of authority detailed above, plaintiff sustained the damages hereinbefore alleged.

**THIRD CLAIM**
**SUPERVISORY LIABILITY FOR DEPRIVATION OF RIGHTS**
**UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983**
**(Against defendant CITY and SGT. JOHN DOE 1)**

56.     Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

57.     By failing to remedy the wrongs committed by his or her subordinates, in failing to properly train, screen, supervise, or discipline his or her subordinates, and by personally participating in the constitutional injuries set forth above, defendant SGT. JOHN DOE 1, in his individual and official capacities, caused damage and injury in violation of plaintiff's rights guaranteed under the United States Constitution, including its Fourth and Fourteenth Amendments, through 42 U.S.C. § 1983.

58.     As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## FOURTH CLAIM
## FAILURE TO INTERVENE – FOURTH AMENDMENT – 42 U.S.C. § 1983
### (Against Officer-Defendants)

59.     Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

60.     Members of the NYPD have an affirmative duty to assess the constitutionality of interactions between their fellow members of service and civilians and to intervene where they observe another member of the Police Department or other law enforcement agency employing unjustified and excessive force against a civilian.

61.     Officer-defendants' use of force against plaintiff was obviously excessive and unjustified under the circumstances yet the individual defendants failed to take any action or make any effort to intervene, halt or protect the plaintiff from being subjected to excessive force by other individual defendants.

62.    The officer-defendants' violations of plaintiff's constitutional rights by failing to intervene in other defendants' clearly unconstitutional use of force against plaintiff resulted in the injuries and damages set forth above.


### FIFTH CLAIM
### *MONELL* CLAIM – 42 U.S.C. § 1983
### (Against Defendants CITY, NYC DOC, NYC BOC, PHS)

63.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

64.    All of the acts and omissions by the defendants described above were carried out pursuant to overlapping policies and practices of defendant CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY and its agencies, the NYPD, NYC DOC, NYC BOC, and PHS.

65.    Defendants CITY, NYC DOC, NYC BOC, and PHS by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the officer and medical defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

66.    The acts complained of were carried out by the aforementioned medical defendants in their capacities as employees, agents or contractors of defendants CITY, NYC DOC, NYC BOC, and PHS.

67.    The acts complained of were carried out by the aforementioned officer-defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

68.     The aforementioned customs, practices, procedures and rules of the CITY and the NYPD

include, but are not limited to, the following unconstitutional practices:

    a.  Using excessive force on individuals;

    b.  Failing to supervise, train, instruct and discipline police officers and encouraging
       their misconduct;

    c.  Discouraging police officers from reporting the corrupt or unlawful acts of other
       police officers;

    d.  Retaliating against officers who report police misconduct; and

    e.  Failing to intervene to prevent the above-mentioned practices when they reasonably
       could have been prevented by a supervisor or other agent or employee of the NYPD.

69.     The existence of aforesaid unconstitutional customs and policies may be inferred from

repeated occurrences of similar wrongful conduct, as documented in the following civil rights

actions filed against the CITY and analogous prosecutions of police officers:

    a.  Carmody v. City of New York, 05-CV-8084 (HB), 2006 U.S. Dist. LEXIS 83207
       (S.D.N.Y.) (police officer alleges that he was terminated for cooperating with another
       officer's claims of a hostile work environment);

    b.  Powers v. City of New York, 04-CV-2246 (NGG), 2007 U.S. Dist. LEXIS 27704
       (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after
       testifying about corruption within the NYPD);

    c.  Nonnemann v. City of New York, 02-CV-10131 (JSR) (AJP), 2004 U.S. Dist. LEXIS
       8966 (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early
       retirement after reporting a fellow officer to IAB and CCRB for the officer's
       suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youth);

    d.  Barry v. New York City Police Department, 01-CV-10627 *2 (CBM), 2004 U.S.
       LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged
       retaliatory demotion and disciplinary charges in response to sergeant's allegations of
       corruption within her unit and alleged that the NYPD had an "unwritten but pervasive
       custom of punishing officers who speak out about police misconduct and
       encouraging, if not facilitating, silence among officers");

    e.  Walton v. Safir, 99-CV-4430 (AKH), 122 F.Supp.2d 466 (S.D.N.Y. 2000) (factual
       findings after trial that a 12-year veteran of NYPD was terminated in retaliation for

16

criticizing the racially-motivated policies of the NYPD's Street Crime Unit and for alleging that such policies led to the NYPD shooting death of AmadouDiallo);

f.   <u>White-Ruiz v. City of New York</u>, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y. 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption"); and,

g.   <u>Ariza v. City of New York</u>, 93-CV-5287 (CPS), 1996 U.S. Dist. LEXIS 20250 at*14 (E.D.N.Y.) (police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of a policy to retaliate against police officers who expose police misconduct and a failure to train in the police department).

70.   Furthermore, the existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct,** are further evidenced, *inter alia*, by the following:

a.   The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse.It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resources anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[2]

---

[2]   Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/ 4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

b. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

c. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in <u>Colon v. City of New York</u>, 09-CV-00008 (E.D.N.Y.), in which he noted a "widespread... custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, Commissioner KELLY acknowledged, "When it happens, it's not for personal gain. It's more for convenience."[3]

d. Regarding defendant CITY's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a CITY agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[4]When it does, however, Police Commissioner KELLY controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during KELLY's tenure, only one-quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (<u>i.e.</u>, closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[5]As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[6]

71. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the**

---

[3]    Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

[4]    In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%). In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%). *See*, CCRB Jan.-Dec. 2007 Status Report at p. 19, *available at* http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf. Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted *de facto* policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, <u>inter alia</u>, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

[5]    Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19.

[6]    Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

**corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct**, are further evidenced, *inter alia*, by the following:

    a.  Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

    b.  In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

    c.  Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

72.    The existence of the above-described unlawful *de facto* policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the CITY, including, without limitation, Commissioner Kelly.

73.    The actions of the officer-defendants resulted from and were taken pursuant to the above-mentioned *de facto* policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves of their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors, commanders and Commissioner Kelly who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the

malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

74.     All of the foregoing acts by defendants deprived the plaintiff of federally protected rights, including, but limited to, the constitutional rights enumerated in paragraphs "24 - 48" above.

75.     Defendant CITY knew or should have known that the acts alleged herein would deprive the plaintiff of his rights, in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

76.     Defendant CITY is directly liable and responsible for the acts of the officer-defendants because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them, and because it repeatedly and knowingly failed to enforce the rules and regulations of the CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

77.     Despite knowledge of such unlawful *de facto* policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including Commissioner KELLY, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

78.     The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned CITY policies,

practices and/or customs, the individual defendants felt empowered to exercise unreasonable and wholly unprovoked force against plaintiff. Pursuant to the aforementioned CITY policies, practices and/or customs, defendants failed to intervene in or report other defendants' violation of plaintiff's rights or subsequent perjury.

79.     Plaintiff's injuries were a direct and proximate result of the defendant CITY and the NYPD's wrongful *de facto* policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant CITY, SGT. JOHN DOE 1 and the NYPD to properly supervise, train and discipline their police officers.

80.     The actions of the individual police defendants resulted from and were taken pursuant to the following *de facto* policies and/or well-settled and widespread customs and practices of the CITY, which implemented by agents or employees of the NYPD, of employing wholly unprovoked and excessive force.

81.     Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers and were directly responsible for the violation of the plaintiff's constitutional rights.

**SIXTH CLAIM**
**TITLE II OF THE AMERICANS WITH DISABILITIES ACT OF 1990,**
**42 U.S.C. § 12101 *ET SEQ.***
**(Against CITY, NYC DOC, NYC BOC and Medical Defendants)**

82.     Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

83.     Mr. GARDNER is a "qualified individual with a disability" under 42 U.S.C. § 12131.

84.     Defendant CITY violated Title II of the ADA, 42 U.S.C. § 12131-12134(2), 12182, *et seq.*

85.     Title II of the ADA applies to defendant CITY and its agencies. Title II affirmatively requires that governmental agencies modify and accommodate their practices, policies, and procedures as necessary to avoid discriminating against individuals with disabilities.

86.     New York City and its subsidiaries, defendants NYPD, NYC DOC, NYC BOC, and PHS are public entities.

87.     Defendants' denial of access to proper medical care constituted an unlawful denial of services to Mr. GARDNER by reason of his disabilities.

88.     As a result of this violation, Mr. GARDNER has endured and continues endure unnecessary pain and suffering, humiliation, and injury to his right to be free from discrimination based on his disabilities.

### SEVENTH CLAIM
### RESPONDEAT SUPERIOR LIABILITY OF THE CITY OF NEW YORK FOR VIOLATIONS OF THE LAWS OF THE STATE OF NEW YORK
#### (Against CITY and Defendant SGT. JOHN DOE 1)

89.     Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

90.     The conduct of the officer-defendants alleged herein, occurred they were on duty and in uniform, and/or in and during the course and scope of their duties and functions as NYPD officers, and/or while they were acting as an agent and employee of defendant CITY, clothed with and/or invoking state power and/or authority, and, as a result, defendant CITY is liable to plaintiff pursuant to the state common law doctrine of respondeat superior.

91.     As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## EIGHTH CLAIM
## VIOLATIONS OF THE CONSTITUTION OF THE STATE OF NEW YORK
### (Against Officer-Defendants)

92.     Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

93.     The officer-defendants' conduct alleged herein breached the protections guaranteed to Mr. GARDER by the New York State Constitution, Article I, § 12, the right to freedom from unreasonable seizure of his person, including the excessive use of force.

94.     Officer-defendants' deprivation of plaintiff's rights under the New York State Constitution resulted in the injuries and damages set forth above.

## NINTH CLAIM
## ASSAULT AND BATTERY
## UNDER THE LAWS OF THE STATE OF NEW YORK
### (Against Officer-Defendants)

95.     Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

96.     By the actions described above, officer-defendants did inflict assault and battery upon plaintiff.  The acts and conduct of defendants were the direct and proximate cause of injury and damage to plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

97.     As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## TENTH CLAIM
## INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## UNDER THE LAWS OF THE STATE OF NEW YORK
### (Against Officer-Defendants)

98.     Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

99.     By the actions described above, defendants engaged in extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to plaintiff.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

100.     As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

## ELEVENTH CLAIM
## MEDICAL MALPRACTICE
## UNDER THE LAWS OF THE STATE OF NEW YORK
### (Against Medical Defendants)

101.     Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

102.     Through the acts or omissions described above, the medical defendants deviated from the acceptable standard of medical care during their treatment of Mr. GARDNER on January 3, 2011 and thereafter.

103.   Through the acts or omissions described above, the medical defendants proximately caused and/or contributed to Mr. GARDNER's injuries.

104.   Mr. GARDER sustained personal injuries, costs for assistance with daily living, incurred expenses for care, treatment, attorney's fees, and damage to personal property, and other consequent damages, in amounts to be proven at trial.

## TWELFTH CLAIM
### NEGLIGENCE
### UNDER THE LAWS OF THE STATE OF NEW YORK
#### (All Defendants)

105.   Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

106.   The defendants, jointly and severally, negligently caused injuries, emotional distress and damage to the plaintiff.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

107.   As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

### JURY DEMAND

108.   Plaintiff demands a trial by jury in this action on each and every one of his damage claims.

## PRAYERS FOR RELIEF

WHEREFORE, plaintiff demands judgment against the defendants jointly and severally and prays for relief as follows:

a.   That he be compensated for violation of his constitutional rights, pain, suffering, mental anguish, and humiliation; and

b.   That he be awarded punitive damages against the individual defendants; and

c.   That he be compensated for attorneys' fees and the costs and disbursements of this action; and

d.   For such other further and different relief as to the Court may seem just and proper.

Dated:      New York, New York
            March 30, 2012

                                    Respectfully submitted,


                        By:   _____/s/_____

                              David B. Rankin
                              Jane L. Moisan
                              Law Office of Rankin & Taylor
                              *Attorneys for the Plaintiff*
                              350 Broadway, Suite 701
                              New York, New York 10013
                              t:212-226-4507